## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## VALDOSTA DIVISION

| | | |
|---|---|---|
| JAMES HENRY ROBERTS, III, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | CASE NO.: 7:14-cv-210 (WLS) |
| ARCHBOLD MEDICAL CENTER | : | |
| d/b/a ARCHBOLD MEMORIAL | : | |
| HOSPITAL, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## ORDER

Presently pending before the Court is a Motion for Summary Judgment filed by Defendant Archbold Medical Center ("Archbold") (Doc. 11). For the following reasons, Archbold's Motion for Summary Judgment (Doc. 11) is **GRANTED**.

## PROCEDURAL HISTORY

On December 31, 2014, Plaintiff James Henry Roberts III filed the Complaint in this sex discrimination and retaliation action under Title VII of the Civil Rights Act of 1964, as amended at 42 U.S.C. § 2000e, *et seq.* (Doc. 1.) Roberts received a Right to Sue letter from the Equal Employment Opportunity Commission (EEOC) on October 2, 2014 after filing an EEOC charge on February 21, 2014 and a subsequent amendment on June 4, 2014. (Docs. 14 at 21-28.) On March 4, 2016, after the close of discovery, Archbold moved for summary judgment. (Doc. 11.) Roberts responded on March 15, 2016. After receiving an extension of time, Archbold replied on April 14, 2016. (Doc. 21.) The Court finds that Archbold's Motion for Summary Judgment (Doc. 11) is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(a).

## SUMMARY JUDGMENT STANDARD

### I. Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment where no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cnty.*, 552 F. App'x 902, 904 (11th Cir. 2014) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by demonstrating to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24. Once the movant has met its burden, the nonmoving party is required "to go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To avoid summary judgment, the nonmoving party "must do more than summarily deny the allegations or 'show that there is some metaphysical doubt as to the material facts.'" *Matsushita*, 475 U.S. at 586 (citations omitted). Instead, the nonmovant must point to record evidence that would be admissible at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d

1316, 1322 (11th Cir. 1999)) (noting that hearsay may be considered on a motion for summary judgment only if it "could be reduced to admissible evidence at trial or reduced to admissible form"). Such evidence may include affidavits or declarations that are based on personal knowledge of the affiant or declarant. *See* Fed. R. Civ. P. 56(c)(4).

On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *See Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646. However, the Court must grant summary judgment if there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## II.    Local Rule 56

Local Rule 56 requires the following:

> The respondent to a motion for summary judgment shall attach to the response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried. Response shall be made to each of the movant's numbered material facts. All material facts contained in the moving party's statement which are not specifically controverted by the respondent in respondent's statement shall be deemed to have been admitted, unless otherwise inappropriate.

M.D. Ga. L.R. 56. Here, Archbold properly filed a summary judgment motion with a statement of undisputed facts, as required by the Federal Rules of Civil Procedure and the Local Rules of this Court. (Doc 11-2.) Roberts filed a document that contains both his own statement of facts and a response to Archbold's statement of facts. (Doc. 17.)

## FACTUAL BACKGROUND[1]

The following facts are derived from the Complaint (Doc. 1), Archbold's Answer (Doc. 6), Archbold's Statement of Undisputed Material Facts (Doc. 11-2), Roberts' Response to Archbold's Statement of Undisputed Material Facts (Doc. 17), and the record in this case. Where relevant, the factual summary also contains undisputed and disputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits,

---

[1] The Court "recite[s] the profane language that allegedly permeated this workplace exactly as it was spoken in order to present and properly examine the social context in which it arose." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 803 (11th Cir. 2010).

all of which are construed in a light most favorable to Roberts as the nonmovant. *See* Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 322-23.

Defendant Archbold Medical Center operates hospitals and nursing homes throughout south Georgia, including Archbold Memorial Hospital in Thomasville and Grady General Hospital in Cairo. (Doc. 11-2 at 1.) Plaintiff James Henry "Trey" Roberts III began working in the Bio-Med shop at Archbold Memorial Hospital in Thomasville on December 17, 2007. (*Id.*) Horace Hunter supervised the Bio-Med shop until April 2013 and was Roberts' supervisor. (*Id.* at 1-2.) Clay Newman became the acting supervisor of the Bio-Med shop in April 2013 and eventually became the permanent supervisor. (*Id.* at 2.) Newman replaced Hunter as Roberts' immediate supervisor. (*Id.*) During the relevant time period, both Hunter and Newman reported to Jim Bue, Vice Present of Facilities Management. During the relevant time period, Zach Wheeler was the Senior Vice President of Human Resources. Other Archbold employees who worked in the Bio-Med shop with Roberts included John "Johnny" Ginocchio, Billie "David" Murray, Arthur Lee "Tyrone" Bacon, Nick Norwood, Joel "Ricky" Ross, and Daniel Todd. An issue of fact exists as to whether Ricky Ross and Daniel Todd had supervisory duties and responsibilities within the Bio-Med shop. (*Id.* at 2-3.) Both stated in their declarations that they did not, but Roberts testified in his deposition that while Horace Hunter was out on medical leave, Ross and Todd handled Bio-Med shop concerns and "held the shop meetings and accountability from there forward." (*Compare* Docs. 15-6 at ¶ 4; 15-7 at ¶ 4 *with* Doc. 14 at 46.)

Archbold had sexual harassment and employee grievance policies and procedures with which Roberts was familiar. (Doc. 11-2 at 3-4.) Roberts kept contemporaneous notes of jokes, comments, and actions made within the Bio-Med shop that he considered offensive. (*Id.* at 4.) Sometime around December 2013, Roberts created a document entitled "Trey's Issues in Bio-Med Dept." in order to track the jokes, comments, and actions he considered offensive for Jim Bue's review. The incidents listed in that document are as follows:

(1)     In January 2011, Horace Hunter threatened to, but did not actually, write up Roberts and four other employees for responding to a work order instead of checking email;

(2)      on July 18, 2011, Horace Hunter called Roberts "stupid" in front of other staff;

(3)      on July 30, 2011, Hunter threatened Roberts and Nick Norwood with termination but did not actually terminate them;

(4)      on August 20, 2011, Roberts was insulted during a department meeting but does not recall how;

(5)      on August 27, 2011, Hunter told Roberts "in front of other employees that he was not needed and could choose to leave at any time";

(6)      on September 26, 2011, Johnny Ginocchio presented Roberts with a woman's dress during a staff meeting, stating, "we've got a present for you";

(7)      on October 11, 2011, Horace Hunter asked Roberts about the dress;

(8)      on November 15, 2011, Horace Hunter teased Roberts about the dress;

(9)      on April 9, 2012, Ricky Ross called Roberts a "transvestite" during a department meeting, and Roberts confronted Ross about the comment and threatened to fight Ross outside of work hours;

(10)     on April 11, 2012, Horace Hunter remarked, "if the dress fits . . .";

(11)     on July 20, 2012, Hunter said that regarding surgery room booms, Roberts was a "dumb ass";

(12)     on September 30, 2012, Hunter threatened Roberts with being written up and terminated over an issue with preventive maintenance but did not actually write up or terminate Roberts;

(13)     on or about September 30, 2012,[2] Hunter threatened Roberts after Roberts met with Jim Bue to discuss questions related to work orders;

(14)     on October 12, 2012, Johnny Ginocchio gave Roberts a "fairy princess veil" to go with the dress he was given in October 2011; and

(15)     on December 17, 2013, David Murray told Roberts to "shut up."

(Doc. 11-2 at 5-10.) Of the incidents alleged in Roberts' list, the fourteenth is the only one for which there is a genuine dispute of fact. Ginocchio and David Murray stated in their

---

[2] Roberts' notes indicate September 31, which is not a date in the Julian calendar.

declarations that Ginocchio brought the veil for Murray's wife who was referred to as a "princess." Murray threw it away in the trash can, and Roberts picked it out of the trash can to give to his daughter. (Docs. 11-2 at 9-10; 15-2 at 2; 15-3 at 2.) Roberts objects to Ginocchio and Murray's declarations as being inadmissible and irrelevant. With regard to some of the other incidents, Archbold cites evidence in the record that either contradicts the allegations in Roberts' document or provides further context for the allegations. Roberts did not object to any of Archbold's statements of fact elaborating on the allegations other than the one regarding the October 12, 2012 veil incident.

Around September 2012, Roberts met with Jim Bue to discuss his complaints about his work environment. During that meeting, Roberts and Bue discussed the September 2011 dress incident. Bue then discussed Roberts' complaints with Horace Hunter and requested that Hunter "institute a more professional working environment and discourage such light-hearted banter . . . ." (Doc. 11-2 at 11.) Bue also addressed the issues with several of the Bio-Med shop techs, including Ginocchio, Norwood, Bacon, Todd, and Ross. (*Id.*)

In December 2013, Jim Bue met with Roberts and Zach Wheeler to discuss Roberts' work environment. During that meeting, Roberts presented his document entitled "Trey's Issues in Bio-Med Dept." Roberts stated that he found the work environment to be hostile and objectionable and did not wish to be exposed to it any longer. (*Id.* at 12.) During the meeting, Bue asked Roberts if transferring to a position outside the Bio-Med shop would be an acceptable solution. (*Id.* at 12.) Bue, Roberts, and Wheeler discussed a solution whereby Roberts would be moved to an office in the engineering building at Grady General Hospital in Cairo, Georgia and would provide support to three different Archbold hospitals. Roberts' new duties would include providing support to surgery centers and receiving cross-training in supporting dialysis facilities. Roberts accepted the proposed transfer. (*Id.* at 13.)

Roberts began his new position at Grady General Hospital on January 9, 2014. Roberts continued to report to Clay Newman. His pay remained the same, and Archbold reimbursed him for mileage. (*Id.* at 14.) However, Roberts alleges there was no opportunity for advancement and that he continued to be subjected to harassment and a hostile work environment on an almost daily basis. (Doc. 14 at 21.) Roberts' new position required him to travel to the Bio-Med shop occasionally for meetings and to pick up equipment. Those visits

did not occur on a daily basis and typically lasted no more than five or ten minutes. (Doc. 11-2 at 15.)

Between February and May 2014, Jim Bue periodically asked Roberts how his new position was going. Roberts did not indicate that anything was wrong. Also, during that timeframe, Bue learned that Roberts frequently stopped by the Bio-Med shop even when he did not have to. (*Id.* at 15.)

On February 21, 2014, Roberts filed a charge with the Equal Employment Opportunity Commission (EEOC). (*Id.*; Doc. 14 at 21.) The charge included an allegation that in January 2011, Roberts was asked by a co-worker if he wore makeup and was from then on called "Mary Kay"[3] by several co-workers. Roberts later testified that the employee who asked him if he wore make-up was Leigh Martin, and the employees who called him "Mary Kay" were Martin, Daniel Todd, Ricky Ross, and Johnny Ginocchio. (Doc. 11-2 at 16.) The charge also included allegations about the September 26, 2011 dress incident and alleged that Roberts was presented with a veil to go with the dress at an October 12, 2012 staff meeting. The charge alleged that Roberts reported the harassment to Jim Bue and was thereafter threatened by Ricky Ross, the acting supervisor of the Bio-Med shop, "that people who take matters into their own hands no longer work there." (Doc. 14 at 21.)

In March 2014, Zach Wheeler sent Jim Bue a copy of Roberts' EEOC charge. Bue then told Clay Newman about the charge. (*Id.*) Newman did not tell any of the Bio-Med shop employees about Roberts' EEOC charge. (*Id.*; *see* Doc. 17 at 15 (disputing but citing no evidence to the contrary).)

On June 4, 2014, Roberts emailed Perry Mustian, the CEO of Archbold, copying Wheeler and Bue on the email. (Doc. 11-2 at 17.) In the email, Roberts described several incidents he believed were offensive and retaliatory. (*Id.*; Doc. 13-1 at 72-74) Those incidents were:

(1) on May 16, 2014, Ricky Ross called Roberts "stupid" and an "idiot[] for trying to be a 'Lone Ranger'" for not calling the Bio-Med shop for assistance in troubleshooting a networking problem at one of the hospitals;

---

[3] The Court notes that Mary Kay is a cosmetics brand.

(2)   on May 19, 2014, Ginocchio said that Nick Norwood had rubbed suntan lotion on him;

(3)   on May 21, 2014, when Roberts said his mother needed new bras, Ginocchio said, "why don't you just give her some of yours?";

(4)   on May 26, 2014, someone wrote "again" next to Robert's name on an "out to lunch" entry on the employee sign-out board;

(5)   on May 26, 2014, Ginocchio presented David Murray with anti-gas medication during a department meeting;

(6)   on May 26, 2014, Ginocchio said to Tyron Bacon, "come here and let me give you a big kiss" in expressing his gratitude to Bacon for working on some IV pumps;

(7)   on June 2, 2014, Ricky Ross told David Murray, when discussing shoe sizes, to "come over here and when I put my foot up your ass, you can tell me what size shoe I have";

(8)   on June 2, 2014, after Nick Norwood thanked David Murray for mentioning that department members need to have their payroll punches approved, Murray said to Norwood, "come here, and I'll give you a 'special' reminder";

(9)   on June 2, 2014, when Norwood was discussing repairing his lawn mower, Ginocchio stated that he (Ginocchio) "was good at getting it up and that it helps him to pull on it and did [Norwood] need help pulling on it";

(10)   on June 3, 2014, Ginocchio and Tyrone Bacon were discussing ultrasound gel and lubricant, and Ginocchio told Bacon to try using the lubricant as ultrasound gel, remarking, "what do you have to lose? You already lost your virginity";

(11)   on June 3, 2014, Murray said to Roger Armstrong, another Bio-Med tech, that he "should have seen Johnny and Tyrone in the elevator yesterday," to which Armstrong replied he heard that "Johnny went down as it went up";

(12)   on June 3, 2014, Bio-Med shops employees joked about Ginocchio and Norwood being naked and inches away from each other on a park bench; Ricky Ross spoke as though he were "watching them sexually";

(13)   on June 3, 2014, Ginocchio said during a department meeting that a special
test hood had been created for Roberts with the word "Pussy" written on it, and
other staff members laughed.

(Docs. 11-2 at 17-21; 13-1 at 72-74.) Also in his June 2014 email, Roberts alleged that Jim Bue and Clay Newman threatened him to "keep [his] productivity up" and that Ricky Ross called him a "cross dressing, makeup wearing, mother fucker, who needs a training bra." (Doc. 13-1 at 74.) Roberts also asserted that he had been "singled out and personally punished" for following Archbold's sexual harassment and reporting policies. (*Id.*) Roberts believed this was so in part because Bio-Med shop personnel told him he "was trying to get them fired and not to talk if [he] was around." (*Id.*; Doc. 13 at 164.)

After Roberts sent his June 2014 email, Clay Newman was asked to conduct a comprehensive investigation of the allegations, which involved interviewing the entire Bio-Med staff. Additionally, after Roberts' June 2014 email, Jim Bue directed Clay Newman not to conduct any more Bio-Med meetings or department meetings without Bue or Newman present.[4] Newman discontinued the weekly Bio-Med meetings, instead incorporating them into the monthly Engineering Department meetings.

After the June 2014 email, Roberts made no further complaints to Newman. (Doc. 11-2 at 23.) During June and July 2014, Roberts voluntarily sat by Ginocchio at several department functions. (*Id.*) On September 9, 2014, Roberts met with Bue and Newman to discuss his belief that his workload was too heavy. During that meeting, Roberts did not make any complaints about his work environment. (*Id.*)

## ANALYSIS

### I.   Defining Roberts' Count One Claim

"Employment discrimination law has become an area of great—and often needless—complexity in the federal courts." *Wright v. Southland Corp.*, 187 F.3d 1287, 1289 (11th Cir. 1999). The pleadings and summary judgment briefing in this case make clear that the Parties have not agreed on exactly what Roberts' claims are. The Parties do appear to agree, and the

---

[4] A fact agreed to by the Parties (see Docs. 11-2 at 22; 17 at 17), though it is unclear how Newman could ever "conduct" meetings for which he was not present. Presumably others were no longer permitted to conduct meetings without Bue or Newman present.

Court so finds, that Roberts has asserted a claim for retaliation, which was listed as Count Two in the Complaint. (Doc. 1 at 4.)

Where the Parties are at odds with each other, and perhaps Roberts is at odds with himself, is with regard to Count One, captioned "Gender Discrimination." Count One alleges that Roberts was a victim of "sexual harassment" and "disparate treatment" on the basis of his "sex/gender." (Doc. 1 at 3.) Roberts further alleges he was discriminated against for "not fitting the general description of a 'male.'" (Doc. 1 at 3.) Roberts alleges Archbold's "conduct and omissions constitute intentional discrimination and unlawful employment practices based on gender/sex in violation of the laws applicable to this action." (*Id.* at 4.) However, peculiarly, Roberts' Statement of Facts proclaims, "this is not a sexual harassment case. Rather, this is a gender[] discrimination case. The harassing comments and misconduct of Defendant's agents need not have a 'sexual connotation' . . . ." (Doc. 17 at 12.)

A brief overview of employment law is in order. "Under Title VII of the Civil Rights Act of 1964, an employer may be found liable for unlawful sex discrimination under any one of three discrete theories: pattern and practice discrimination, disparate treatment discrimination, or disparate impact discrimination. . . . [I]n a pattern and practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's 'standard operating procedure.'" *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1273-74 (11th Cir. 2000). No pattern or practice was alleged here; Roberts has presented no statistical evidence. "[D]isparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group." *Id.* at 1274 (emphasis in original). The hostile environment Roberts alleges was not a "neutral" policy.

That leaves disparate treatment discrimination, in which "the plaintiff bears the ultimate burden of proving that the employment action at issue was taken because of the plaintiff's sex." *Id.* Disparate treatment claims come in two forms: "(1) harassment which culminates in a 'tangible employment action,' such as discharge, demotion or undesirable reassignment, and (2) harassment in which no adverse 'tangible employment action' is taken but which is sufficient to constructively alter an employee's working conditions." *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1280 (11th Cir. 2003) (quoting *Frederick v.*

*Sprint/United Management Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001)). The latter is traditionally known as a "hostile work environment" claim. *Id.*

Roberts' Complaint does not contain the phrase "hostile work environment." (*See* Doc. 1.) However, Archbold's Motion for Summary Judgment presumes Count One is a hostile work environment claim. (Doc. 11-1.) In his response brief, Roberts states, "Plaintiff claims hostile work environment discrimination and sexual harassment based on his gender." (Doc. at 5.) However, in the same brief, Roberts claims to have also had a "tangible employment action" taken against him. (*Id.* at 7-8.)

The Court understands Roberts claim as follows: he was the alleged victim of disparate treatment discrimination on the basis of his sex which resulted in the creation of a hostile work environment. Roberts' adoption and subsequent disavowal of the phrase "sexual harassment" is immaterial. A sexual harassment claim is not a unique type of disparate treatment; the standard used for determining whether a work environment was hostile due to harassment on the basis of sex is the same used in determining whether it is hostile on the basis of other protected characteristics such as race. *Compare Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1279 (11th Cir. 2003) (sex discrimination) *with Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (race discrimination). Whether a comment is of a sexual nature is only relevant in helping to determine whether the harassment was on the basis of the plaintiff's sex. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1302 (11th Cir. 2007) (considering whether comments were "sexually charged" or otherwise "sex specific").

While Roberts asserts the harassment also resulted in a tangible employment action against him, (Doc. 16 at 8), his discussion only alleges a retaliatory transfer (which was already alleged in Count II) and is contained under the header "Plaintiff Was Victim of Hostile-Environment Harassment Based on His Gender." See *id.* ("there was no prompt and remedial action to protect [Roberts] from the ongoing acts of retaliation"; "Plaintiff, after reporting the discriminatory and hostile treatment, had no opportunity for advancement"). It

does not appear from his brief that Roberts is actually asserting any tangible employment action beyond the hostile work environment.[5]

## II.   Exhaustion

Archbold first argues that Roberts' discrimination claim was not timely exhausted. (Doc. 11-1 at 10-11.) Roberts completely failed to respond to Archbold's timely exhaustion argument in his response brief. (*See* Doc. 16.) "Before a potential plaintiff may sue for discrimination under Title VII, [he] must first exhaust [his] administrative remedies. The first step down this path is filing a timely charge of discrimination with the EEOC." *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citations omitted). Failure to administratively exhaust is an appropriate ground upon which to grant summary judgment. *Swain v. Hoffman*, 547 F.2d 921, 923 (5th Cir. 1977).[6] In Georgia, an EEOC charge must be filed within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). A plaintiff has the initial burden of establishing that a federal court complaint was timely filed and administratively exhausted, and if the defendant contests this issue, the plaintiff has the burden of establishing that he met the timely filing and exhaustion requirements. *Green v. Union Foundry Co.*, 281 F.3d 1229, 1233-34 (11th Cir. 2002).

Hostile work environment claims are claims for continuing violations "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). With regard to hostile work environment claims, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120 (2002).

---

[5] However, even assuming Roberts was in fact claiming the transfer to be an adverse employment action under 42 U.S.C. § 2000e-2(a) in addition to an act of retaliation under 42 U.S.C. § 2000e-3(a), his claim would be insufficient to survive summary judgment as an adverse employment action for these same reasons—discussed herein—that it is not an unlawful act of retaliation. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (scope of retaliatory protection is greater than scope of substantive discrimination protection).

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

"A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2015) (quotations omitted). "Courts are 'extremely reluctant' to bar Title VII claims based on procedural technicalities and will allow judicial claims that 'amplify, clarify, or more clearly focus' the EEOC complaint allegations." *Rodriguez v. Sec'y of Dep't of Veterans Aff.*, 605 F. App'x 957, 957 (11th Cir. 2015) (per curiam) (quoting *Gregory*, 355 F.3d at 1279). To determine whether a complaint falls within this scope, the Court considers whether the complaint is "like or related to, or grew out of, the allegations contained in her EEOC charge." *Id.* Plaintiffs may not raise "[a]llegations of new acts of discrimination" in the judicial proceedings. *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989) (quotations omitted). In *Rodriguez v. Sec'y of Dep't of Veterans Aff.*, the Eleventh Circuit held that lawsuit allegations of "mocking" were not sufficiently related to the "discrete events including assignment of duties, performance evaluations, and compensation" plaintiff identified in her EEOC hostile work environment charge such that the EEOC was on notice of the need to investigate that claim. 605 F. App'x at 958.

Roberts filed his EEOC charge on February 21, 2014. (Doc. 14 at 21.) The charge is brief and does not contain all of the incidents alleged in the document entitled "Trey's Issues in the Bio-Med Dept." (*Id.*) The charge alleges Roberts was "subjected to disparate treatment and merciless harassment by his co-workers and supervisor." (*Id.*) The charge included an allegation that in January 2011, Roberts was asked by a co-worker if he wore makeup and was from then on called "Mary Kay" by several co-workers. The charge also included allegations about the September 26, 2011 dress incident and alleged that Roberts was presented with a veil to go with the dress at an October 12, 2012 staff meeting. The charge alleged that Roberts reported the harassment to Jim Bue and was thereafter threatened by Ricky Ross, the acting supervisor of the Bio-Med shop, "that people who take matters into their own hands no longer work there." (Doc. 14 at 21.) Finally, Roberts alleged that he was then transferred to a different work location with no opportunity for advancement and continued to be subjected to harassment and a "hostile work environment" on an almost daily basis. (*Id.*)

It appears from the record that Roberts attempted to amend his EEOC charge on June 4, 2014, submitting a list of the events he described in his June 4, 2014 email to Perry Mustian, the CEO of Archbold. (Docs. 13-1 at 72-74; 14 at 22-24.) The amendment is entitled "Retaliatory and Other Incidents at Work" and charges retaliation and further incidents of discrimination and sexual harassment. A number of the discriminatory acts alleged in Roberts' Complaint occurred before August 25, 2013 and thus more than 180 days before Roberts filed his EEOC charge. Further, some of the discriminatory acts Roberts alleged in his Complaint, primarily Roberts' resignation from Archbold, occurred after June 4, 2014, the date Roberts amended his EEOC charge.

As to the incidents occurring before August 25, 2013, more than 180 days before Roberts filed his EEOC charge, which relate primarily to Roberts' sexual harassment claim, the Court may consider "the entire scope of a hostile work environment clam, including behavior alleged outside the statutory time period . . . for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory period." *Morgan*, 536 U.S. at 106. The only incident that occurred after August 25, 2013 and before February 21, 2014 was Roberts' transfer to his new position. However, the Court need not consider whether the transfer alone is "sufficiently related" to the pre-August, 25, 2013 allegations of mocking and offensive comments because Roberts amended his EEOC charge to include more allegations of mocking and offensive comments. *Rodriguez*, 605 F. App'x at 958. Thus, the pre-August 24, 2013 allegations in Roberts' Complaint are "like or related to" the incidents alleged in his EEOC charge, as amended, and the Court finds that it may consider them, though not timely exhausted or even exhausted at all because they "amplify, clarify, or more clearly focus" Roberts' EEOC charge. *Gregory*, 355 F.3d at 1279 (quotations omitted).

The record also shows that on January 12, 2015, Roberts turned in his notice of resignation, indicating that his last day of work would be January 27, 2015. (Doc. 11-2 at 24.) Roberts was paid through January 27, 2015 as well as for accrued paid time off "even though he did not work the full two-week period following his notice of resignation." (*Id.* at 25.) In his response brief, Roberts argues that he was constructively discharged. (Doc. 16 at 13.) However, Roberts filed his Complaint on December 31, 2014 and did not include allegations

of constructive discharge. (Doc. 1.) Furthermore, Roberts made no attempt to amend his complaint to include the constructive discharge. (*See* Docket.) The Court therefore declines to consider whether Roberts' resignation was an adverse employment action, whether it was a constructive discharge or not, because it is a discrete incident that was not pleaded in the complaint or administratively exhausted. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) (holding that claims not raised in complaint cannot be raised for the first time in plaintiff's response to defendant's motion for summary judgment). For that reason, the Court omits Roberts' resignation from its findings of fact and finds that the resignation, to the extent it is alleged as a constructive discharge, has not been properly pleaded or administratively exhausted.

For those reasons, the Court finds that Roberts timely exhausted his hostile work environment and retaliation claims, except with regard to the allegation that Roberts' resignation was a constructive discharge, which is a discrete act that was not administratively exhausted or properly pleaded.

### III.   *Prima Facie* Case for Hostile Work Environment

Although Title VII does not mention hostile work environments, the Supreme Court and Eleventh Circuit have long held the phrase "terms, conditions, or privileges of employment" prohibits it. *Mendoza v. Borden, Inc.*, 195 F.3d 1239, 1244 (11th Cir. 1999) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The parties agree there is no direct evidence of discrimination in this case. (Docs. 11-1 at 8; 16 at 5.) Rather, this is a case involving circumstantial evidence of discrimination. Traditionally in such cases the Court applies the *McDonnell-Douglas* framework.[7] *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253,

---

[7] In *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016), the Eleventh Circuit rejected the use of *McDonnell Douglas* for so-called "mixed-motive" claims—ones in which the plaintiff asserts "that illegal bias, such as bias based on sex or gender, was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id.* at 1235 (quotations omitted). Rather, a plaintiff need only show that "(1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was a motivating factor for the defendant's adverse employment action." *Id.* at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008)). Confusingly, Roberts faults Archbold for "inexplicitly fail[ing] to address *Quigg*," yet then applies the *McDonnell-Douglas* framework. (Doc. 16 at 5.) The Eleventh Circuit has yet to decide if a mixed-motive analysis applies to a hostile work environment claim. *McKitt v. Alabama Alcoholic Beverage Control Bd.*, 571 F. App'x 867, 874 n.9 (11th Cir. 2014). At least one circuit has rejected its application. *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994) ("An employer could never have a legitimate reason for creating a hostile work environment."). Because both parties apply *McDonnell Douglas*, the Court does as well. In any event, even if *Quigg* applies, the Court's analysis

1264 (11th Cir. 2010). "Under *McDonnell Douglas,* the initial burden rests on the plaintiff to establish, by a preponderance of the evidence, a prima facie case of discrimination. Once the plaintiff has set out a prima facie case, a presumption of discrimination arises. The intermediate burden of production then shifts to the employer to articulate a legitimate, non-discriminatory explanation for [the disparate treatment]." *Turnes v. AmSouth Bank, NA*, 36 F.3d 1057, 1060-61 (11th Cir. 1994).

To establish a prima facie case of a hostile work environment, a plaintiff must show the following:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Roberts meets the first prong of the test. He is a male, and thus protected by Title VII. *See Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) ("The employee belongs to a protected group[;] . . . this requires a simple stipulation that the employee is a man or a woman."). There can also be no doubt he was the victim of unwelcome harassment. Roberts alleges he was insulted based on his work performance, called offensive names, and was the subject of comments suggesting he was feminine or a woman. (*See generally* Doc. 11-2 at 5-10, 17-21; 13-1 at 72-74.)

### A.  Based on a protected characteristic

This case is unusual in that Roberts, as a man, purports to have been harassed by other men due to his sex. That sort of "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). But, "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils" and Title VII fully extends to male-on-male harassment. *Id.* Plaintiffs in such cases however often face

---

will show Roberts has failed to demonstrate that sex was a motivating factor of the harassment. *See McKitt*, 571 F. App'x at 874 n.9.

additional obstacles in establishing a motive for the harassment. "Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id.* at 80. The Supreme Court has suggested three, nonexclusive ways in which a plaintiff may show the discrimination was "because of sex" in a male-on-male case:

> (1) "if there were credible evidence that the harasser was homosexual" or that the harassing conduct was motivated by actual homosexual desire; (2) if the harassment occurs "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility [towards members of the same sex] in the workplace[;]" and (3) if there is "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

*Whitehurst v. Liquid Envtl. Sols., Inc.*, 45 F. Supp. 3d 1328, 1343 (M.D. Fla. 2014) (quoting *Oncale*, 523 U.S. at 80-81); *see E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 455 (5th Cir. 2013) (collecting cases holding list to be nonexclusive).

Roberts has presented no evidence that any of his alleged harassers are homosexual or motivated by homosexual desires. Similarly, the alleged harassment was not so sex-specific and hostile to suggest the harassers had a general hostility toward men. Finally, there is little direct comparative evidence about how the alleged harassers treated women in the workplace. Roberts asserts that there were "two females in the unit at one point or another, but there has never been an instance where any female's [sic] been called up in a department meeting and singled out and given inappropriate clothing for their job dress [sic] or anything." (Doc. 17 at 7 (quotations omitted).) However, as Archbold points out, "there was only one female in [Roberts'] unit during [Roberts'] employment; and that person's employment ended on January 20, 2010, some 20 months prior to the incident about which Plaintiff has complained." (Doc. 21 at 5.) The lack of harassment directed toward a single woman, whose employment ended well before the events alleged in this case, is not evidence that the harassment allegedly directed at Roberts was because of his sex.

Another route available to Roberts to demonstrate the harassment was on the basis of sex is through evidence that the harassment was based on stereotypes of his sex or gender.

> In *Price Waterhouse v. Hopkins*, 490 U.S. 228 . . . (1989), the Supreme Court held that discrimination on the basis of gender stereotype is sex-based discrimination. In that case, . . . a senior manager at Price Waterhouse was denied partnership in the firm because she was considered "macho," and "overcompensated for being a woman." Six members of the Supreme Court agreed that such comments were indicative of gender discrimination and held that Title VII barred not just discrimination because of biological sex, but also gender stereotyping—failing to act and appear according to expectations defined by gender.

*Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (citations omitted).[8] Again, a lack of evidence is fatal to Roberts' case. Roberts himself has not presented evidence that he fails to conform to the stereotype of a male in any way. He adheres to the stereotype that men are sexually attracted to women; Roberts is married. (Doc. 13 at 13:11-12.) There is no evidence he "spoke in a high-pitched voice, walked in an effeminate manner, groomed his nails, crossed his legs [or] had a tendency to shake his foot the way a woman might." *E.E.O.C. v.*

---

[8] *Price Waterhouse* was a plurality decision. However, nearly every circuit has concluded that gender stereotyping is sex discrimination under Title VII. *See, e.g., Morales-Cruz v. Univ. of Puerto Rico*, 676 F.3d 220, 224-25 (1st Cir. 2012); *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119 (2d Cir. 2004); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001); *E.E.O.C. v. Boh Bros. Const. Co.*, 731 F.3d 444, 453 (5th Cir. 2013); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 572 (6th Cir. 2004); *Hively v. Ivy Tech Cmty. Coll., S. Bend*, No. 15-1720, 2016 WL 4039703, at *4 (7th Cir. July 28, 2016); *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010); *Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001). Two circuits, the Fourth and the District of Columbia, have a dearth of case law on the issue. One circuit, the Tenth, has conspicuously left the issue open. *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) ("[t]his court need not decide whether discrimination based on an employee's failure to conform to sex stereotypes always constitutes discrimination 'because of sex'"). Our circuit, the Eleventh, has recognized on three occasions that *Price Waterhouse* established that discrimination on the basis of gender stereotypes is evidence of discrimination on the basis of sex; however, the statements were arguably dicta in all three cases. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1245 (11th Cir. 2016) (establishing standard for circumstantial evidence in mixed-motive cases); *Glenn v. Brumby*, 663 F.3d 1312, 1319 (11th Cir. 2011) (recognizing cause of action for sex-stereotyping under 42 U.S.C. § 1983); *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1283 (11th Cir. 2000) (remanding case when district court applied standard for disparate impact to company's facially-discriminatory policy). One district court has asserted the issue is still open in our circuit and questioned whether following the rule of the plurality in *Price Waterhouse* is "good jurisprudence." *E.E.O.C. v. McPherson Companies*, 914 F. Supp. 2d 1234, 1242 n.8 & 1243. Based on the great weight of authority across other circuits and our own circuit's interpretation of *Price Waterhouse*, this Court has no hesitation in accepting sex-stereotyping as a viable theory under Title VII. "[W]e are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group . . . ." *See Price Waterhouse*, 490 U.S. at 251 (1989).

*McPherson Companies*, 914 F. Supp. 2d 1234, 1244 (citing *Prowel v. Wise Business Forms, Inc.*, 579 F.3d 285, 291 (3rd Cir. 2009)). Similarly, there is no evidence Roberts "w[ore] jewelry that was considered too effeminate, carr[ied] a serving tray too gracefully, or t[ook] too active a role in child-rearing." *Glenn v. Brumby*, 663 F.3d 1312, 1318-19 (11th Cir. 2011).

The sole piece of evidence in the record that supports Roberts' claim is Ross' admission that he called Roberts "Mary Kay" because of Roberts' smooth skin. (Doc. 24 at 17:10-13.) The Court understands smooth skin to be only loosely associated with femininity, and Roberts has not introduced any evidence as to its association. There is no other evidence that Roberts did or was perceived to deviate from any male stereotype in any other way.

"[I]t is a circular truth that a plaintiff may not recover based on nonconformance to gender stereotypes unless the plaintiff conforms to nonconformance gender stereotypes." *E.E.O.C. v. Boh Bros. Const. Co.*, 689 F.3d 458, 462 (5th Cir. 2012), *aff'd in part and vacated in part*, 731 F.3d 444 (5th Cir. 2013). The comments allegedly made to Roberts imply he dressed in women's clothing (Doc. 11-2 at 7-9, 18), wore make-up (Doc. 14 at 21), and was otherwise effeminate (Doc. 11-2 at 21 (giving Roberts a test hood with "pussy" written on it)). Even viewing the evidence in the light most favorable to Roberts, a reasonable jury could not conclude the implications were true, were believed by the harassers to be true, or that Roberts' level of compliance to stereotypes of his gender were a basis for the harassment. Counsel's assertion that "the chief reason for creating a hostile work environment for Plaintiff was that saw [sic] him as a feminine male, and all its [sic] harassment was oriented around their perception of his gender characteristics" does not contain a citation to the record and is unsupported by the evidence. (Doc. 16 at 6.)

Roberts was far from the only employee to be the target of inappropriate comments tinged by sex and gender. Ginocchio implied that Norwood was attracted to other men (Doc. 11-2 at 17, 20) and expressed an interest is kissing Bacon (*Id.* at 19). Norwood made a sexual remark to Murray (*Id.*) and implied Bacon and Ginocchio had engaged in a sexual act (*Id.* at 20). Some unnamed employees joked that Ginocchio and Norwood had engaged in a sexual act (*Id.* at 21). There is no evidence any of these employees failed to adhere to gender stereotypes or were otherwise discriminated against on the basis of sex. Were the Court to conclude that these comments were sufficient to establish a *prima facie* case of sex

discrimination absent any other supporting evidence, seemingly every employee in the Bio-Med department could bring a claim of sex discrimination—regardless of their gender, presentation of their gender, or their sexual orientation. Sex stereotyping would divorce from the statutory requirement that the discrimination be because of sex.

The workplace comments are better understood, not as harassment based on all of these employees' failure to adhere to some unnamed and unknown gender stereotype, but "simply expressions of animosity or juvenile provocation." *Hamm v. Weyauwega Milk Prod., Inc.*, 332 F.3d 1058, 1064 (7th Cir. 2003) (quoting *Johnson v. Hondo, Inc.*, 125 F.3d 408, 412 (7th Cir.1997)); *see also* Luke A. Boso, *Real Men*, 37 U. Haw. L. Rev. 107 (2015) ("Social scientists . . . commonly find that men harass other men to prove or shore up their own masculinity.").

Offensive, sexual comments do not inherently create a hostile work environment under Title VII. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (finding workplace harassment to not "automatically [be] discrimination because of sex merely because the words used have sexual content or connotations"). "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). There is no evidence here that Roberts either failed to adhere to gender stereotypes or was otherwise discriminated against on the basis of sex. The alleged harassment targeted many employees and there is no evidence the comments were uniquely degrading to Roberts, given the lack of evidence that he failed to adhere to gender stereotypes. *Cf. Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (indiscriminate use of words "bitch" and "slut" degrade women more than men).

The remaining allegations are entirely unrelated to Roberts' sex. He has not presented any evidence that the threats of disciplinary action, general insults, and allegations he was a poor employee were related to any gender stereotype and the Court cannot divine a connection.

Roberts has failed to demonstrate that the harassment he received was based on a protected characteristic. Accordingly, he does not present a *prima facie* case of discrimination.

## IV.   Roberts' Retaliation Claim

The retaliation clause, or opposition clause, to Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because [that employee] opposed any practice made an unlawful employment practice" by Title VII. *Dixon v. The Hallmark Cos., Inc.*, 627 F.3d 849, 856 (11th Cir. 2010) (citing 42 U.S.C. § 2000e-3(a)). "Examples of unlawful employment practices include differentiating compensation and benefits or classifying employees on the basis of race, sex, or religion." *Id.* (citing 42 U.S.C. § 2000e-2(a)). To state a claim for retaliation under Title VII, a plaintiff must allege the following elements: "(1) [he] participated in an activity protected by Title VII; (2) [he] suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse action." *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001).

Under *McDonnell-Douglas* burden-shifting, the plaintiff bears the initial burden of establishing his *prima facie* case. *Gardner v. Aviagen*, 454 F. App'x 724, 728 (11th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802-03). The burden then shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* If the defendant does so, the plaintiff must make a showing that the nondiscriminatory reason was pretextual. *Id.*

It is unclear from the complaint what the alleged adverse employment action is. Roberts stated in his complaint, in bare-boned fashion, that he "is a member of a protected class because he reported unlawful employment practices and was the victim of retaliation thereafter." (Doc. 1 at 5.) In his response to the Motion for Summary Judgment, Roberts clarified that the alleged adverse actions were "his transfer to a more isolated workstation" at Grady General Hospital and "his constructive discharge." (Doc. 16 at 12.) As discussed *supra*, the allegation of constructive discharge has not been properly pleaded or administratively exhausted. Therefore, the Court declines to consider it.

A materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Courts consider whether a reasonable person in the employee's unique circumstances would perceive the action as materially

adverse. *Id.* at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."). The Eleventh Circuit has held that a transfer can be an adverse employment action "if it involves a reduction in pay, prestige, or responsibility." *Hinson v. Clinch Cnty., Ga. Bd. of Educ.*, 231 F.3d 821, 829 (11th Cir. 2000). "[A] *purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (emphasis in original); *see Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1449 (11th Cir. 1998) (describing *Williams* as "persuasive authority"). "Any adversity must be material; it is not enough that a transfer imposes some *de minimis* inconvenience or alteration of responsibilities." *Doe*, 145 F.3d at 1453 (footnote omitted); *see White*, 548 U.S. at 68 ("it is important to separate significant from trivial harms").

Roberts' pay remained the same in his new position. (Doc. 11-2 at 14.) However, he alleges that he has "incurred additional expense, and suffered unreimbursable expenses such as additional wear and tear on his truck by being transferred to a more remote location." (Doc. 16 at 12.) Roberts was reimbursed by Archbold at $0.50 per mile that he drove to the new work location. (Doc. 13-1 at 67, 71.) The Court recognizes that the reimbursement covers some amount of depreciation to Roberts' vehicle. Even assuming the price of a gallon of gas is as high as $4.00 per gallon, a vehicle would need an extremely low average of eight miles per gallon in fuel economy in order for the reimbursement to only cover fuel. The record contains no evidence as to the amount of unreimbursed wear and tear Roberts' actually suffered. But even assuming there was some amount not covered by the reimbursement rate, it would still be a trivial harm falling short of an adverse employment action. *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1138 (N.D. Ga. 2004) ("That Burnette likely would incur additional vehicle maintenance . . . does not affect the conclusion that the reassignment was not an adverse employment action.").

It is unclear what other "additional expense[s]" Roberts is claiming to have suffered. In making the claim, he does not cite any facts in the record. (*See* Doc. 16 at 12.) Roberts also does not allege any additional costs in his Statement of Disputed Facts, but does claim that the transfer "separated him from his primary job duties" and resulted in an "excessive

workload." (Doc. 17 at 8, 10.) Roberts alleges that he was trained on the equipment at Archbold's main facility and Grady General Hospital did not have the same equipment. (Doc. 13 at 120-21.) Roberts has failed to show this change was more than *de minimis*. A transfer is not adverse solely because an employee will require additional training. *Doe*, 145 F.3d at 1453 ("all transfers require some learning, since they require employees to work with new people or products and to assume new responsibilities").

Roberts has also failed to demonstrate that he was subjected to an excessive workload. An employee's statement that he was given additional or difficult work, absent any other evidence, is insufficient to establish a *prima facie* showing of an adverse employment action. *English v. Bd. of Sch. Comm'rs of Mobile Cty.*, 83 F. Supp. 3d 1271, 1282 (S.D. Ala. 2015). Similarly, Roberts claims he had no opportunity for advancement after the transfer, but has failed to produce any evidence supporting that statement. (Doc. 14 at 21.) "[C]onclusory and unsubstantiated allegations" are insufficient to survive a motion for summary judgment. *Burgest v. Colquitt Cty.*, 177 F. App'x 852, 855 (11th Cir. 2005).

Accordingly, Roberts cannot demonstrate an adverse employment action was taken against him. He has failed to establish a *prima facie* case of unlawful retaliation.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Archbold Medical's Motion for Summary Judgment (Doc. 11) is **GRANTED**.

**SO ORDERED**, this 16th day of November, 2016.

/s/ W. Louis Sands
**W. LOUIS SANDS, SR. JUDGE**
**UNITED STATES DISTRICT COURT**